•           •           • 
 • • •




OPINION

No. 04-10-00041-CV

DYNEGY, Inc.,
Appellant
 
v.

Terry W. YATES, Individually, and Terry W. Yates, P.C.,
Appellees

From the 127th Judicial District Court, Harris County, Texas
Trial Court No. 2005-37892
Honorable Sharolyn P. Wood, Judge Presiding

OPINION ON APPELLEES’ MOTION FOR REHEARING
 
 Opinion by:    Phylis J. Speedlin, Justice 
 
Sitting:            Catherine Stone, Chief Justice
Phylis J. Speedlin, Justice
Marialyn Barnard, Justice
 
Delivered and Filed: February 23, 2011 
 
REVERSED AND RENDERED
            The panel, on its own motion, has reconsidered the motion for rehearing filed by appellees,
Terry W. Yates, Individually, and Terry W. Yates, P.C., on June 30, 2010, and has determined that
its analysis of the statute of frauds issue in its opinion dated August 25, 2010 is erroneous. 
Accordingly, this court’s opinion and judgment dated August 25, 2010 are withdrawn, and this
opinion and judgment are substituted.
            Dynegy, Inc. appeals the trial court’s judgment in favor of Terry W. Yates, Individually, and
Terry W. Yates, P.C. (collectively “Yates”) for fraud arising out of an oral contract for the payment
of attorney’s fees. Among other issues on appeal, Dynegy asserts the judgment must be reversed
because of insufficient evidence to support the jury finding of fraud in the formation of an oral
contract for attorney’s fees. Because we hold the evidence is legally insufficient, we reverse the trial
court’s judgment based on the jury’s fraud finding and render judgment on the jury’s findings on the
alternative theory of breach of contract. 
Factual and Procedural Background
            On June 10, 2003, Jamie Olis, a former officer of Dynegy, was indicted on multiple counts
of securities fraud, mail and wire fraud, and conspiracy arising out of Olis’ work on a complex
financing transaction known as “Project Alpha” while he was Senior Director of Tax Planning in
Dynegy’s Tax Division. Pursuant to its articles of incorporation, the Dynegy Board of Directors
passed a resolution in October 2002 that authorized the advancement of attorney’s fees and expenses
to certain officers and directors, including Jamie Olis, who were under investigation for their roles
in Project Alpha. The resolution stated in relevant part that reasonable legal expenses arising out
of Project Alpha were to be advanced to Olis upon receipt of (i) a signed statement that he had acted
in good faith and in the corporation’s best interests, with no reasonable cause to believe his conduct
was unlawful, and (ii) a signed undertaking to repay the legal expenses if the Board ultimately
determined he did not meet the standard of conduct required for indemnification. The Board
resolution also provided, “such approval may be modified or revoked by this Board at any time as
a result of changes in circumstances or further analysis.” Olis signed the written undertaking in
January 2003, and agreed to repay his legal expenses if it was determined he did not meet the
indemnification standard.
            Ten days after his indictment, on June 20, 2003, Olis hired criminal defense attorney Terry
W. Yates to defend him in the federal criminal prosecution and in the on-going civil investigation
conducted by the Securities and Exchange Commission (“SEC”). Olis told Yates, and his associate
Mark Clark, that Dynegy would be paying his legal fees. That day, Clark called Cristin Cracraft, an
attorney in Dynegy’s legal division, to confirm that Dynegy would pay Olis’ legal fees and to discuss
the payment procedure. During the phone call, Clark told Cracraft that Olis had hired Yates to
represent him and asked for confirmation that Dynegy was paying Olis’ legal expenses. Clark
testified that Cracraft stated, “the Board has passed a resolution, so, yes, we are paying Jamie Olis’
fees,” and instructed Clark that the bills should be submitted to her. Cracraft stated the hourly rates,
however, should be negotiated with Olis because he was Yates’ client, not Dynegy. Cracraft’s trial
testimony about her conversation with Clark was consistent with Clark’s version. 
            Yates testified that he made an oral agreement with Olis that he (Yates) would look solely
to Dynegy for payment of his fees for representing Olis. Olis signed a written fee contract with
Yates on June 20, 2003 specifying the hourly rates to be charged and agreeing that he (Olis) was
financially responsible for payment of Yates’ legal fees. Although Dynegy’s name is not mentioned,
the written contract contains a phrase stating “all fees are due when billed unless other specific
arrangements have been made.” At trial, Yates testified this modifier was intended to refer to the
fact that Dynegy was paying Olis’ fees because Yates orally agreed with Olis never to look to him
for payment of the legal fees. Yates further testified that he called Cracraft on June 20, 2003, after
he faxed her the written fee contract signed by Olis which showed the hourly rates to be charged. 
Yates stated that Cracraft confirmed that she received the fax and told him that Dynegy would pay
Olis’ legal fees directly to Yates through trial. Cracraft contradicted Yates’ testimony about the
phone call, however, stating that she never spoke to Yates on the phone that day, and in fact had
never spoken to or met Yates as of the date of trial. Finally, Yates testified that he relied on
Cracraft’s oral promise that Dynegy would pay Olis’ legal fees directly to Yates through trial.
            On August 13, 2003, Dynegy hand-delivered a letter to Yates, addressed to Olis, stating that
it would directly pay Yates his legal fees billed through August 17, 2003; after that date, Dynegy
would pay the fees into an escrow account pursuant to a July 23, 2003 Board resolution. Dynegy
paid Yates’ June invoice for $15,000 within two weeks of its submission, but then mistakenly
escrowed the $105,000 for Yates’ July invoice; it was paid in November 2003 after Olis’ criminal
trial ended. Yates submitted a third and final invoice for $448,556, representing all work performed
from August 2003 through April 2004, including the November 2003 trial. Dynegy initially
escrowed that amount, but later rejected payment of Yates’ third invoice.
            Yates filed suit against Dynegy to recover his unpaid attorney’s fees.


 Yates alleged breach
of contract and fraudulent inducement and sought benefit-of-the-bargain damages for both claims. 
After a three-week trial, a jury found in favor of Yates on both his breach of contract claim and his
fraud claim, awarding him (a) $448,556 in actual damages for breach of contract plus $574,718 in
attorney’s fees through trial (plus appellate fees), and (b) $500,000 in actual damages for fraud plus
$2 million in punitive damages. Yates elected to recover under his fraud claim. On May 25, 2007,
the trial court entered judgment in favor of Yates for $500,000 in actual damages, plus pre-judgment
interest, and $2 million in punitive damages, plus costs of court and post-judgment interest. Dynegy
now appeals.
Statute of Frauds
            We begin our analysis by examining whether the statute of frauds bars enforcement of the
oral contract. The statute of frauds requires that certain types of promises or agreements, such as a
promise by one person to pay the debt of another, be in writing and signed by the party to be charged. 
Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(2) (West 2009). Generally, whether a contract falls
within the statute of frauds is a question of law. Bratcher v. Dozier, 162 Tex. 319, 346 S.W.2d 795,
796 (1961); Beverick v. Koch Power, Inc., 186 S.W.3d 145, 149 (Tex. App.—Houston [1st Dist.]
2005, pet. denied). We review questions of law de novo. El Paso Natural Gas Co. v. Minco Oil &
Gas, Inc., 8 S.W.3d 309, 312 (Tex. 1999); Rittmer v. Garza, 65 S.W.3d 718, 722 (Tex.
App.—Houston [14th Dist.] 2001, no pet.).
            Dynegy argues the judgment below should be reversed and rendered because the oral
agreement between Yates and Dynegy was to answer for the debt of a third person, i.e., Jamie Olis,
and therefore is unenforceable under the statute of frauds. Dynegy notes that Yates failed to plead
an exception to the statute of frauds, and failed to secure jury findings establishing an applicable
exception to the statute of frauds. See Adams v. Petrade Int’l, Inc., 754 S.W.2d 696, 705 (Tex.
App.—Houston [1st Dist.] 1988, writ denied) (whether exception to statute of frauds applies is
generally question of fact); see also Otto Vehle & Reserve Law Officers Ass’n v. Brenner, 590
S.W.2d 147, 152 (Tex. Civ. App.—San Antonio 1979, no writ) (same). Therefore, Dynegy asserts
that both Yates’ fraud claim seeking benefit-of-the-bargain damages and his alternative breach of
contract theory are barred. Yates responds that the statute of frauds does not preclude his claims
because: (1) Dynegy failed to meet its burden to prove the statute of frauds applies when it did not
seek summary judgment or a directed verdict, or submit a jury question, on that issue; (2) Dynegy’s
promise to pay Yates’ legal fees as they were incurred was not a promise to answer for the debt of
another; (3) the contract was completely performed by Yates; and (4) the oral contract was performed
within one year.
            The first question we must address is whether Dynegy met its burden of proof on its
affirmative defense of the statute of frauds. Yates argues that Dynegy failed to meet its burden when
it did not move for summary judgment or a directed verdict on that ground, and did not submit a jury
question on the statute of frauds. We agree that statute of frauds is an affirmative defense which is
waived if not pleaded. See Tex. R. Civ. P. 94; Phillips v. Phillips, 820 S.W.2d 785, 791 (Tex. 1991). 
In addition, the party pleading the statute of frauds bears an initial burden to establish its
applicability. Brenner, 590 S.W.2d at 152. We disagree, however, that a motion for summary
judgment or directed verdict is required. Here, Dynegy pled the affirmative defense of the statute
of frauds in its answer, and moved for judgment notwithstanding the verdict on the basis of the
statute of frauds, thereby preserving it as a ground for judgment as a matter of law. Tex. R. Civ. P.
301; T.O. Stanley Boot Co., Inc. v. Bank of El Paso, 847 S.W.2d 218, 220 (Tex. 1992). 
            We next examine whether the oral contract was a promise by Dynegy to pay Olis’ debt. It
is a well-settled rule of law that if services are performed for one party upon the promise of another
to pay for the services, then the promisor is not liable for the debt of another, but for his own
obligation. Kinney v. Pearce, 65 S.W.2d 502, 503 (Tex. Civ. App.—Beaumont 1933, no writ);
Evans v. Shaw, 268 S.W. 1037, 1038 (Tex. Civ. App.—Waco 1925, no writ) (“Wherever the main
purpose and object of the promisor is, not to answer for another, but to subserve some purpose of
his own, his promise is not within the statute, although it may be in form a promise to pay the debt
of another, and although the performance of it may incidentally have the effect of extinguishing the
liability of another.”). A distinction must be drawn between a promisor’s primary obligation, which
escapes the prohibitions of the statute of frauds, and a collateral obligation that does not. 
Shahan-Taylor Co. v. Foremost Dairies, Inc., 233 S.W.2d 885, 888 (Tex. Civ. App.—San Antonio
1950, writ ref’d n.r.e.). In determining whether Dynegy was bound to a primary or secondary
obligation, the intention of the parties must be examined. See id.; see also Morris v. Carter, 261
S.W.2d 614, 616 (Tex. Civ. App.—Dallas 1953, writ ref’d n.r.e.). The intention of the parties may
be determined by considering all of the surrounding facts and circumstances, including: (1) the words
and expressions used by the parties; (2) the parties’ acts and conduct; (3) whether the services were
rendered before or after the promise; (4) the manner in which the seller carried the account on his
books; (5) the manner in which payments were made; (6) the purpose of the agreement; and (7) the
promisor’s interest in the transaction. See Shahan-Taylor, 233 S.W.2d at 888; Morris, 261 S.W.2d
at 616. “Unconditional and undisputed facts in many instances are enough to show, as a matter of
law, either an oral, contemporaneous, unconditional promise to perform the obligation of a contract,
on the one hand, or, on the other, that credit is given a debtor with another promisor as surety of
guarantor, creating only a collateral agreement.” Shahan-Taylor, 233 S.W.2d at 889.
            In Banfield v. Davidson, the court examined a promise to pay for services rendered to another
and held the promise was an original undertaking or primary obligation. Banfield v. Davidson, 201
S.W. 442, 443 (Tex. Civ. App.—Galveston 1918, no writ). In that case, J.A. Banfield was driving
a vehicle that struck and injured Johnny Van. Id. at 442. Banfield brought Van to a hospital owned
by Dr. G.L. Davidson. Id. Davidson subsequently sued Banfield to recover the costs of the services
provided to Van. Id. Davidson alleged that Banfield promised to pay Davidson for his services to
Van before any services were undertaken, performed, or rendered. Id. Banfield denied making any
such promise. Id. A jury found that Banfield promised to pay for the services and awarded
Davidson damages. Id. at 443. On appeal, Banfield asserted the trial court erred in refusing to
instruct the jury that a person cannot be liable upon a promise to answer for the debt of another
unless the agreement is in writing. Id. at 443. The appellate court held that Banfield’s agreement
was an original undertaking, noting, “[t]here is no contention by either party that it is alleged in the
pleadings of either party or shown by the evidence that the medical services or hospital
accommodation given to Johnny Van were first performed, and thereafter a promise was made by
appellant to pay the reasonable value for such services, etc.” Id. Accordingly, the court concluded
the cause of action alleged and proven was not subject to the statute of frauds. Id.
            Similarly, in Kinney, H.G. Pearce sued Cleveland Kinney alleging that he sold goods to
William and Eugene Dempsey based on Kinney’s promise to pay for the goods. Kinney, 65 S.W.2d
at 502-03. Kinney denied making the promise and also asserted the oral promise was to answer for
the debt of another and not enforceable under the statute of frauds. Id. at 503. A jury found that
Kinney agreed to pay Pearce for the goods. Id. On appeal, Kinney asserted the jury should have
been asked about the timing of Kinney’s agreement to pay for the goods. Id. The appellate court
overruled this assertion, noting the evidence was undisputed that the promise was made before the
goods were sold. Id. The court concluded, “[u]nder the finding of the jury, the promise of appellant
was an original undertaking, and not collateral, and therefore the statute of frauds did not apply.” 
Id.
            Finally, in Evans, a physician rendered services for the appellant’s adult son and his son’s
wife. Evans, 268 S.W. at 1037. The charges for those services amounted to $102. Id. When the
son again became ill, the physician informed appellant that he would not treat the son any further
unless the appellant agreed to pay for both the new services and the prior charges. Id. The physician
alleged the appellant promised to pay for the services to be performed and the prior charges, which
the appellant denied. Id. A jury found the appellant agreed to pay for the services and awarded the
physician $188 ($102 for the prior charges and $86 for the new services performed). Id. On appeal,
the appellant asserted that the physician was not entitled to recover based on the statute of frauds. 
Id. at 1038. As to the $86 for the new services performed, the appellate court held that the services
were performed only after the appellant promised to pay for them; therefore, “appellant’s obligation
to pay was an original primary obligation.” Id. The court applied a different analysis to the $102
since the debt was pre-existing at the time appellant promised to pay it. Id. at 1038-39.
            In Bledsoe v. Pritchard, the appellate court explained the difference between a primary
obligation and a collateral obligation. Bledsoe v. Pritchard, 107 S.W.2d 742 (Tex. Civ.
App.—Amarillo 1937, no writ). One of the issues raised on appeal was whether the statute of frauds
barred the recovery of damages for boarding services provided to LaVerne and Elise Owenbey, who
were the nieces of the appellant, Sallie Pritchard, and the daughters of Joe Owenbey. Id. at 742-43. 
The court reasoned:
We think it is well settled that the plaintiff would have been obligated to pay
the defendants for this board bill if she had agreed to do so unconditionally and the
girls had been accepted in the home of defendants under such understanding. If the
plaintiff had so promised and the defendants had relied thereon, it would have
become plaintiff’s own obligation and debt and not that of her brother or nieces, and
therefore would not have come within the statute of frauds. [internal citations
omitted]. In the present case, however, the defendants admitted on cross-examination
they were looking to Joe Owenbey primarily for this obligation, and that if he did not
pay the debt, then Mrs. Pritchard was expected to do so. The defendant R.H. Bledsoe
testified that Mrs. Pritchard promised to pay the debt if Owenbey did not. Such a
conditional promise, we think, would bring the alleged promise within the statute of
frauds. . . .
 
Id. at 744; see also Morris, 261 S.W.2d at 616 (promise to pay for repairs to a third party’s car was
not subject to statute of frauds where promise was made before the repairs were undertaken);
Shahan-Taylor, 233 S.W.2d at 889 (promise by dairy to pay for feed delivered to owner of dairy herd
held to be primary obligation not subject to statute of frauds). But see Kothmann v. Hall, No.
03-09-00081-CV, 2010 WL 2789805, at *4 (Tex. App.—Austin Jul. 15, 2010, no pet.) (mem. op.)
(foundation’s verbal approval of assistance to applicants in need of orthodontic services was not an
assumption of the primary obligation but was, at most, a promise to answer for debt of another
person subject to statute of frauds).
            Looking beyond Texas cases to the Fifth Circuit, we find Pravel, Wilson & Matthews v. Voss,
471 F.2d 1186 (5th Cir. 1973), to be instructive. In that case, a stockholder of a company consulted
a lawyer regarding a patent infringement suit. Id. at 1187. The lawyer agreed to take the case but
sought assurance that his law firm would be paid for its services. Id. at 1187-88. The stockholder
referred the lawyer to the president of the company, who told the lawyer to “go for broke” and that
he would “take care” of the fee. Id. at 1188. Subsequently, the president was held personally liable
for the unpaid fees. Id. On appeal, the president asserted that he promised only to guarantee
payment by the company and, since the promise was not in writing, its enforcement was barred by
the statute of frauds. Id. The Fifth Circuit rejected this argument. Id. The Fifth Circuit reasoned
that the president’s promise was not to answer for the debt of the company, but was a promise that
he would personally pay the fees for the services rendered to the company in the patent infringement
suit. Id. at 1189. As a result, the Fifth Circuit concluded the statute of frauds was simply
inapplicable. Id. 
            In the instant case, Dynegy promised to pay for the legal services that Yates was to provide
Olis. The promise was made before the services were undertaken. Dynegy’s Board of Directors
approved payment for Olis’ legal services because Olis was an officer of the company and was under
investigation for actions taken in connection with his work for the company on Project Alpha, which
was a transaction structured to provide substantial benefits to Dynegy. A Dynegy attorney told Yates
and Clark to submit the bills directly to Dynegy, and Dynegy began paying the bills as they were
submitted. The jury found that Dynegy agreed to pay Yates for his services. Under these facts and
circumstances, we hold as a matter of law that Dynegy’s promise was a primary obligation and not
the promise to pay the debt of another. Accordingly, the statute of frauds is inapplicable and does
not bar Yates’ recovery for breach of the oral contract.


 
Legal Sufficiency of the Evidence - Fraud FindingDynegy asserts the evidence is legally insufficient to support the jury’s finding that it
committed fraud against Yates. Specifically, Dynegy asserts there is “no evidence” of fraud because: 
(1) one corporate actor’s statement/representation may not be “mixed and matched” with another
corporate actor’s knowledge or intent to prove that the corporation committed fraud; (2) subsequent
events occurring after formation of the contract may not be used to prove fraudulent inducement of
the contract; (3) speculative evidence or a series of inferences does not constitute any evidence of
fraud; and (4) there is no evidence of Yates’ actual, justifiable reliance on the alleged fraudulent
statements by Dynegy in the August 13, 2003 escrow letter, given the unambiguous writing.
            Yates responds that, when combined with Dynegy’s breach of the oral fee contract, there is
sufficient circumstantial evidence of an intent not to perform by Dynegy on June 20, 2003 to uphold
the jury’s fraud verdict. See Huynh v. Phung, No. 01-04-00267-CV, 2007 WL 495023, at *4 (Tex.
App.—Houston [1st Dist.] Feb. 16, 2007, no pet.) (mem. op.) (slight circumstantial evidence of fraud
in combination with failure to perform as promised is legally sufficient to support finding of
fraudulent intent). In his brief, Yates disclaims any separate reliance on the August 13, 2003 escrow
letter as a separate fraud, stating that it was simply a “continuation of the fraud already begun.” 
Yates relies solely on the oral promise by Cracraft on June 20, 2003 to support the fraud finding
based on fraudulent inducement, asserting that “the fraud was . . . the misrepresentation that Dynegy
would pay the legal bills directly to Yates as incurred.” Therefore, our review of the record and
analysis focuses on whether the elements of fraudulent inducement were present at the time of the
June 20, 2003 oral agreement between Cristin Cracraft and Mark Clark, and Cracraft and Terry
Yates. 
            Additional Background Facts
            Dynegy’s Articles of Incorporation               
            Dynegy was an Illinois corporation during the period in question. Illinois law authorizes a
corporation to advance legal fees to its officers and directors under certain circumstances. 805 Ill.
Comp. Stat. 5/8.75(e) (permitting advancement in corporation’s discretion). Article 7(1)(D) of
Dynegy’s amended articles of incorporation permits the corporation to advance reasonable legal
expenses incurred by officers and directors in a civil or criminal proceeding upon certain terms and
conditions. One such condition is the execution by such officer or director of a statement that he
“acted in good faith and in a manner which he believed to be in, or not opposed to the best interests
of the Corporation,” and an undertaking to repay the legal expenses if it is ultimately determined that
he is not entitled to indemnification. Section D further provides that the Dynegy board of directors
may by resolution provide for securing the payment of authorized advances by creating escrow
accounts with such restrictions as the Board deems appropriate. Section A of Article 7(1) provides
that
the Corporation shall indemnify any person who was or is a party . . . to any . . .
action, suit or proceeding, whether civil, criminal, administrative or investigative .
. . by reason . . . that he is or was a director or officer of the Corporation . . . against
expenses (including attorneys’ fees) . . . if he acted in good faith and in a manner he
reasonably believed to be in or not opposed to be [sic] the best interests of the
Corporation, and, with respect to any criminal action or proceeding, has no
reasonable cause to believe his conduct was unlawful.

            October 2002 Board Resolution Approving Payment of Olis’ Attorney’s Fees
            On October 18, 2002, the Dynegy board of directors passed a resolution under the authority
of Article 7(1)(D) that authorized the advancement of attorney’s fees and expenses to certain officers
and directors, including Jamie Olis, who were under investigation for their roles in Project Alpha. 
The resolution stated in relevant part that reasonable legal expenses arising out of Project Alpha were
to be advanced to Olis “in advance of the final disposition of such action” upon receipt of (i) a signed
statement that he had acted in good faith and in the corporation’s best interests, and (ii) an
undertaking to repay the expenses “if it shall ultimately be determined that he . . . did not meet the
standard of conduct required for indemnification by Dynegy.” The resolution also contained a
condition that, “such approval may be modified or revoked by this Board at any time as a result
of changes in circumstances or further analysis.” In January 2003, Olis signed the written
undertaking representing that he had acted in good faith and agreed to repay the advanced legal
expenses if it was determined he did not meet the indemnification standards. In March 2003, Olis
was terminated and received a severance. Olis signed a letter agreement stating he would continue
to cooperate with the Project Alpha investigations.
            Dynegy’s Discussions with U.S. Attorney about “Cooperation”
            Also in January 2003, Dynegy’s CEO, Bruce Williamson (who had taken over as CEO in
October 2002), received a letter from the Assistant United States Attorney Jimmy Sledge advising
him of the government’s concern that “Dynegy’s ‘cooperation’ is more apparent than real.”
Williamson and Dynegy’s outside counsel met with the U.S. Attorney for the Southern District of
Texas, Michael Shelby, to discuss Dynegy’s cooperation with the investigation. Williamson pledged
Dynegy’s “full cooperation,” understanding that the corporation would be indicted, and forced to
shut down as a result, if it did not fully cooperate. A January 17, 2003 letter from Shelby
memorializes Williamson’s pledge of “full cooperation” on behalf of Dynegy; Williamson had to
provide all documents requested, without redaction, and waive the corporation’s attorney/client
privilege in order to be “in cooperation.”
            On January 20, 2003, the Thompson Memo concerning criminal prosecution of corporations
was issued to all U.S. Attorneys. The Thompson Memo stated that, in determining whether to indict
a corporation, the prosecutor should consider the corporation’s “willingness to cooperate,” and that
part of the “cooperation” analysis includes whether the corporation is advancing attorney’s fees to
culpable employees. The U.S. Attorney had the Thompson Memo hand-delivered to Williamson at
Dynegy. Williamson testified that before he arrived in October 2002 the Board had authorized direct
payment of legal fees for those employees under investigation. Williamson stated that sometime in
the spring of 2003, the government made clear that payment of the legal fees was a factor that
conflicted with a corporation’s “full cooperation” under the Thompson Memo. Subsequently, in
March and May 2003, respectively, Dynegy advised two of the non-officer employees targeted in
the Project Alpha investigation, Richard Gould and Helen Sharkey, that it would no longer pay their
legal expenses for the criminal investigation. Cristin Cracraft drafted the May 2003 letter to Sharkey
terminating payment of her attorney’s fees. 
            Olis Hires Yates on June 20, 2003
            Olis was indicted on June 10, 2003 for securities fraud, mail fraud, wire fraud and
conspiracy, along with his boss Gene Foster and Sharkey. Both Sharkey and Foster ultimately pled
guilty; only Olis proceeded to trial. Olis decided to change attorneys after his indictment, and hired
Terry Yates to represent him in the federal criminal investigation, as well as the on-going SEC
criminal investigation. Olis told Yates, and his associate Mark Clark, that Dynegy would be paying
his legal fees and Yates agreed to look solely to Dynegy for payment. At trial, Yates testified that
he relied on Cracraft’s oral promise made to both Clark and Yates that Dynegy would pay Olis’ legal
fees directly to Yates through trial; contrary to his usual practice, Yates did not request a retainer
from Olis. Further, Yates stated he knew that once he appeared on behalf of Olis in federal court,
the judge would have to consent to any withdrawal.
            Partial Payment of Yates’ Legal Fees
            Dynegy paid Yates directly within two weeks of his first invoice for June 2003 work. Yates’
July invoice for $105,000 was not immediately paid; Yates delayed its submission until October 2,
2003 because he had seen his prior bill in the Dynegy documents at the U.S. Attorney’s office. The 
$105,000 for Yates’ second bill was placed into a Dynegy escrow account pursuant to the July 23
Board resolution modifying the advancement procedure for Olis’ legal fees to require they be placed
in escrow. Cracraft testified she mistakenly put the $105,000 in escrow, instead of paying it directly
to Yates, because she did not realize the bill was for work done during July. Olis’ federal criminal
trial was held in November 2003, resulting in his conviction on all counts. The $105,000 was
ultimately paid to Yates in November, after Olis’ trial was over. In April 2004, Yates submitted his
third and final invoice for $448,556, covering all work performed from August 2003 through April
2004; Dynegy placed that amount in the escrow account pending the Board’s ultimate determination
as to whether Olis had acted in “good faith” while employed at Dynegy. Olis appealed his
conviction and sentence of 24 years. The Fifth Circuit affirmed Olis’ conviction but remanded for
resentencing, at which Olis received a sentence of six years. After Olis’ conviction was final, 
Dynegy’s Board determined in March 2007 that he had not acted in good faith and that Dynegy was
not obligated to indemnify him or to release the escrowed $448,556 in attorney’s fees. Subsequently,
Yates sued Dynegy for fraud and breach of the oral contract to pay his attorney’s fees.
            Trial on Yates’ Unpaid Attorney’s Fees
            At the trial on Yates’ fraud and breach of contract claims, a series of emails between Dynegy
CEO Williamson and Shelby were introduced. One email exchange is dated June 13, 2003, prior
to Cracraft’s oral fee agreement with Clark/Yates on June 20, 2003; it is a cordial exchange with
general references to Dynegy’s cooperation with the investigation but contains nothing regarding
Dynegy’s payment of its employees’ legal fees. About one month later, on July 18 and 19, 2003,
Williamson and U.S. Attorney Shelby exchanged a series of emails about Dynegy’s advancement
of legal expenses for its employees under investigation. Williamson stated to Shelby that, “I am
totally supportive of trying to modify our legal support posture. I have wanted to do so for some
time.” Shelby replied, “Thanks for looking into this. I think it [sic] in neither of our interests to have
the company pay for the defense of individuals whose actions were so egregious.” Williamson
responded, “I actually have been pushing it for about 6 months. Your actions give me ‘probable
cause’ to change.” Williamson sent another email to Shelby in the afternoon on July 19 stating, “I
just reviewed and approved a board resolution to change the process . . . I am no[t] paying for
Sharkey as it is so this impact is to Foster and Olis.” Finally, in the early evening on July 23, 2003,
Dynegy’s outside counsel sent Shelby an attachment email stating, “Attached is the Board resolution
passed today that was the subject of the telephone call Bruce [Williamson] placed to you.” 
Williamson also emailed Shelby that night, saying, “Hope this helps.” The July 23 Board resolution
established an escrow account for “all authorized advances of . . . attorney’s fees incurred by Foster
and Olis” to hold the funds in escrow until the Board made its “good faith” determination. 
Williamson testified that because Olis was a former officer, Dynegy could not simply stop paying
his legal fees under its bylaws and articles; the most Dynegy could do in order to more fully
cooperate with the government was to escrow the legal fees until the Board made a determination
whether Olis had met the “good faith” standard for indemnification under the articles. The Board
ultimately determined that Olis had not acted in good faith, and had engaged in unlawful conduct
while employed at Dynegy, and refused to pay the escrowed $448,556 in fees.     
            Standard of Review  
            When an appellant challenges the legal sufficiency of the evidence to support an adverse
finding on which it did not have the burden of proof, the appellant must show there is no evidence
in the record to support the finding in order to prevail on appeal. City of Pasadena v. Gennedy, 125
S.W.3d 687, 691-92 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). In reviewing the legal
sufficiency of the evidence to support the finding of fraud, we consider all the evidence in the record
in the light most favorable to the jury’s verdict, “crediting favorable evidence if reasonable jurors
could, and disregarding contrary evidence unless reasonable jurors could not.” City of Keller v.
Wilson, 168 S.W.3d 802, 807 (Tex. 2005); Formosa Plastics Corp. USA v. Presidio Eng’rs &
Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998). Anything more than a scintilla of evidence is
legally sufficient to support the finding. Formosa, 960 S.W.2d at 48.
            Here, application of that standard, which requires us to view all the evidence in the light most
favorable to the verdict, means that we must credit Yates’ testimony that he had a conversation with
Cracraft on June 20, 2003 because a reasonable juror could have believed Yates’ testimony and
disbelieved Cracraft’s testimony that no conversation occurred. City of Keller, 168 S.W.3d at 807. 
            Applicable Law
            To establish a common law fraud cause of action, a plaintiff must prove (1) a material
representation was made, (2) which was false, (3) which was either known to be false when made
or which was recklessly made as a positive assertion without knowledge of its truth, (4) which the
speaker made with intent that it be acted upon, and (5) the other party took action in reliance upon
the misrepresentation, and (6) thereby suffered injury. Formosa, 960 S.W.2d at 47; In re FirstMerit
Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001). A contractual promise made with no intention of
performing may give rise to an action for fraudulent inducement. Tony Gullo Motors I, L.P. v.
Chapa, 212 S.W.3d 299, 304 (Tex. 2006). A promise of future performance may form the basis of
a fraud claim if the promise was made with no intention of performing at the time the promise was
made. Formosa, 960 S.W.2d at 48. Mere breach of a contract does not constitute evidence that the
party did not intend to perform; however, “breach combined with ‘slight circumstantial evidence’
of fraud” constitutes some evidence of fraudulent intent and is legally sufficient to support a verdict. 
Tony Gullo Motors, 212 S.W.3d at 305. Evidence must be presented that a representation was made
with the intent to deceive, and with no intention of performing as represented, at the time the
representation was made. Formosa, 960 S.W.2d at 48; Spoljaric v. Percival Tours, Inc., 708 S.W.2d
432, 434 (Tex. 1986). The speaker’s intent at the time of the representation may be inferred from
the speaker’s subsequent acts after the representation was made. Spoljaric, 708 S.W.2d at 434. 
            Analysis
            In the charge, the jury was asked to answer the general broad-form question, “Did Dynegy
Inc. commit fraud against Yates?” The jury was instructed on the basic elements of two fraud
theories—fraud by misrepresentation and fraud by omission of a material fact. The jury was further
instructed that a “misrepresentation” means either a false statement or “a promise of future
performance made with an intent not to perform as promised.” The jury answered in the affirmative. 
In his brief, Yates argues the jury finding of fraud should be upheld because there is sufficient
evidence of fraudulent inducement based on the June 20, 2003 oral agreement, disclaiming reliance
on the August 13, 2003 escrow letter and the non-disclosure theory. Yates argues that the fraud was
“in the misrepresentation that Dynegy would pay the legal bills directly to Yates as incurred.” 
Dynegy argues there is “no evidence” of fraudulent inducement in connection with the June 20, 2003
oral fee agreement because: (1) the same corporate speaker must make the promise and possess the
intent not to perform for the corporation to have committed fraud; (2) subsequent events may not be
used to prove intent not to perform at the time of the promise; (3) mere inferences and speculation,
without more, are not evidence of fraud; and (4) Yates did not prove his actual, justifiable reliance
on the misrepresentation. 
1. “Mixing and Matching” Fraud Elements – Different Corporate Actors 
            Dynegy asserts there is “no ‘mix and match’ theory of fraud” in which one corporate actor
of Dynegy could make the oral promise and another corporate actor could possess the intent not to
perform. It concedes that corporations act through their officers, directors, employees and agents,
and agrees that Dynegy was acting through Cracraft on June 20, 2003.


 Dynegy stresses, however,
that the record contains no evidence that Cracraft made the oral promise on June 20, 2003 with a
conscious intent not to perform as promised. Dynegy argues the only possible evidence of an intent
not to perform by a Dynegy agent is the CEO Williamson’s July 2003 statement that he had wanted
to modify Dynegy’s fee advancement policy for the past six months. It argues the jury’s fraud
finding against Dynegy cannot be supported by “mixing and matching” the oral promise by Cracraft
and the intent not to perform by Williamson.


 
            Dynegy asserts that Yates had to prove that the same corporate representative of Dynegy who
made the oral promise also had the requisite fraudulent intent at the time of the promise. It contends
that the subjective intent and/or knowledge of several corporate actors cannot be combined, or
“mixed and matched,” to satisfy the scienter requirement of fraud. In support, Dynegy relies
primarily on a Fifth Circuit securities fraud case holding that to determine whether a statement by
the corporation was made with the requisite scienter, the appropriate focus is on the state of mind
of the individual corporate official who made the statement rather than on the collective knowledge
of all the corporation’s officers and employees. Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,
365 F.3d 353, 366 (5th Cir. 2004) (citing Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435
(9th Cir. 1995), for proposition that “there is no case law supporting an independent ‘collective
scienter’ theory”). The Fifth Circuit reasoned,
This is consistent with the general common law rule that where, as in fraud, an
essentially subjective state of mind is an element of a cause of action also involving
some sort of conduct, such as a misrepresentation, the required state of mind must
actually exist in the individual making (or being a cause of the making of) the
misrepresentation, and may not simply be imputed to that individual on general
principles of agency.
Id. (citing Restatement Second, Agency § 275, cmt. b; § 268, cmt. d (1958)). The Fifth Circuit
in Southland relies on several other circuit and federal district court opinions similarly rejecting a
“collective scienter” concept for corporations in the context of fraud actions. See id. at 366-67; see,
e.g., Woodmont, Inc. v. Daniels, 274 F.2d 132, 137 (10th Cir. 1959) (“while in some cases, a
corporation may be held constructively responsible for the composite knowledge of all of its agents,
. . . we are unwilling to apply the rule to fix liability where, as here, intent is an essential ingredient
of tort liability as for deceit”); In re Apple Computer, Inc. Sec. Litig., 243 F.Supp.2d 1012, 1023
(N.D. Cal. 2002) (“It is not enough to establish fraud on the part of a corporation that one corporate
officer makes a false statement that another officer knows to be false. A defendant corporation is
deemed to have the requisite scienter for fraud only if the individual corporate officer making the
statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least
deliberately reckless as to its falsity, at the time he or she makes the statement.”); Gutter v. E.I.
Dupont De Nemours, 124 F.Supp.2d 1291, 1311 (S.D. Fla. 2000) (“The knowledge necessary to
form the requisite fraudulent intent must be possessed by at least one agent and cannot be inferred
and imputed to a corporation based on disconnected facts known by different agents.”); United States
v. LBS Bank-New York, Inc., 757 F.Supp. 496, 501 n.7 (E.D. Pa. 1990) (“Although . . . a corporate
defendant is considered to have acquired the collective knowledge of its employees . . . specific
intent cannot be aggregated similarly.”); First Equity Corp. of Florida v. Standard & Poor’s Corp.,
690 F.Supp. 256, 260 (S.D. N.Y. 1988), aff’d, 869 F.2d 175 (2d Cir. 1989) (“While . . . a corporation
may be charged with the collective knowledge of its employees, it does not follow that the
corporation may be deemed to have a culpable state of mind when that state of mind is possessed
by no single employee. A corporation can be held to have a particular state of mind only when that
state of mind is possessed by a single individual.”). Accord Makor Issues & Rights, Ltd. v. Tellabs
Inc., 513 F.3d 702, 708 (7th Cir. 2008). Dynegy also relies on the Texas Supreme Court’s holding
in FirstMerit for the general fraud requirement that “when the representation was made, the speaker
knew it was false or made it recklessly without any knowledge of the truth . . . [and] the speaker
made the representation with the intent that the other party should act upon it.” In re FirstMerit, 52
S.W.3d at 758 (emphasis added).
            Yates briefly responds by arguing that under Texas law, a corporation can only act through
its agents and the fraudulent intent of a corporate officer or agent acting with actual or apparent
authority can be imputed to the corporation. See NationsBank, N.A. v. Dilling, 922 S.W.2d 950, 952-53 (Tex. 1996); Holloway v. Skinner, 898 S.W.2d 793, 795 (Tex. 1995). Yates also asserts that the
two federal circuit cases relied on by Dynegy, Southland and Makor, are federal securities fraud
cases and thus distinguishable. However, Southland cites and relies on several types of fraud cases
for its reasoning that there is no “collective scienter” concept for corporations. See Southland, 365
F.3d at 366-67 (internal citations omitted). Moreover, as noted by Dynegy in its reply brief, the
reasoning used in Southland is based on the traditional common law rules of agency. See id. at 366; 
see also Indiana Elec. Workers’ Pension Trust Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 533-34 (5th Cir. 2008) (reaffirming Southland). 
            Dynegy is correct that the same corporate agent must commit all the elements of fraud before
the corporation may be held liable for the fraud. Therefore, Williamson’s statements in July 2003
that he had the desire and intent to stop paying Olis’ legal fees for the past six months cannot be
combined with Cracraft’s oral promise on June 20, 2003 in a “mix and match” method of fulfilling
all the elements of fraud. Therefore, since Cracraft was the corporate speaker who made the oral
agreement with Clark/Yates, it is her knowledge and intent that is at issue. 
            2. Intent: Subsequent Events After Formation of Oral Contract
            Dynegy argues that “the essential facts at the core of the Plaintiff’s complaint occurred after
formation of the alleged oral agreement – meaning they cannot constitute fraudulent inducement.” 
Specifically, it asserts that Williamson testified the U.S. Attorney first pressured Dynegy to stop
paying its officers’ legal fees on July 15, 2003, and Dynegy’s Board passed the resolution setting up
the escrow procedure on July 23, 2003; because these events occurred one month after formation
of the oral contract on June 20, 2003, it contends they do not constitute any evidence of fraudulent
intent at the time of the oral contract. In support, Dynegy cites Formosa for the basic proposition
that it is the party’s intent at the time the representation is made that is determinative. Formosa, 960
S.W.2d at 48. The law is equally clear, however, that intent at the time of the representation may
be inferred from the speaker’s subsequent acts after the representation. Spoljaric, 708 S.W.2d at
434; Oliver v. Rogers, 976 S.W.2d 792, 804 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). 
A failure to perform a future act as promised is fraud only when there was no intent to perform the
act at the time the promise was made. Oliver, 976 S.W.2d at 804. “[O]therwise, every breach of
contract would involve fraud.” Id. (noting the distinction between cases involving a promise made
without any intention to perform from a promise made with intent to perform but the promisor
changes his mind and refuses to perform). 
            Here, the oral contract was formed on June 20, 2003 during the conversations between Clark
and Cracraft, and Yates and Cracraft. Therefore, the key inquiry is whether there is any evidence
that Cracraft had no intent to perform on June 20, 2003 when she made the oral promise that Dynegy
would directly pay Olis’ legal fees. See Formosa, 960 S.W.2d at 48. The parties’ discussion about
subsequent events being used to show intent at the time of the agreement centers on the email
exchange between Williamson and Shelby, which occurred primarily in July 2003—one month after
the agreement. Given the law, discussed supra, that it is the individual corporate speaker whose
intent must be determined, the subsequent actions by Williamson may not be used to infer Cracraft’s
subjective intent or knowledge on June 20. Yates points to no actions by Cracraft herself after June
20 from which an intent not to perform the oral fee agreement may be inferred. 
            Yates argues there is other evidence, including, for example, the January 2003 Assistant U.S.
Attorney letter about “apparent cooperation” and other emails between Williamson and Shelby,
showing the need for additional cooperation by Dynegy was under discussion before the June 20,
2003 oral fee agreement. Absent some evidence on which to base an inference that Cracraft knew
about these discussions, that evidence does not support an intent not to perform by Cracraft at the
time of the June 20, 2003 oral fee agreement.  
            3. Only Inferences and Speculation – Cracraft’s Fraudulent Intent 
            Dynegy asserts there is no evidence in the record to support a finding that Cracraft, as the
corporate speaker who made the oral fee agreement, had the intent not to perform the oral contract
at the time she made it. See FirstMerit, 52 S.W.3d at 758. It contends that Yates’ theory of fraud
is mere inference stacking and thus cannot support the verdict. 
            Yates stresses that, when combined with Dynegy’s breach of the oral contract, only “slight
circumstantial evidence” of fraud is required to support the jury’s finding of fraudulent intent by
Dynegy. See Huynh, 2007 WL 495023, at *4 (holding slight circumstantial evidence of fraud in
combination with failure to perform as promised was legally sufficient to support finding of
fraudulent intent). Yates argues that there is “an abundance of circumstantial evidence” of Dynegy’s
fraudulent inducement on June 20, 2003. To support an inference of Cracraft’s fraudulent intent
not to perform the June 20, 2003 oral contract, Yates points primarily to Cracraft’s knowledge of the
Thompson Memo’s cooperation requirements in May 2003, her drafting of the May 2003 letter
cutting off Sharkey’s legal fees, Williamson’s July 2003 statement that he had been wanting to
modify the payment of legal fees for six months, and the subsequent August 13, 2003 letter setting
up an escrow procedure which Yates alleged was a scheme to disguise nonpayment as escrow.
            First, the evidence is not clear that Dynegy did breach the oral fee contract. As of February
2004, Dynegy had paid Yates approximately $200,000 in legal fees for work performed prior to
August 18, 2003, and only his last bill for $448,556 was still escrowed; therefore, Dynegy had
partially performed the oral fee contract made by Cracraft. Cracraft’s oral agreement to pay Yates’
legal fees was premised on the October 2002 Board resolution and Olis’ signed undertaking. The
October 2002 resolution approving the payment of Olis’ legal fees contains language permitting
Dynegy’s Board to modify or revoke that approval “at any time as a result of changes in
circumstances or further analysis.” Thus, the Board retained broad authority and discretion to
modify the terms of the Olis fee payments, or even to revoke the payments entirely, at any time based
on any “change in circumstances” or “further analysis.” Williamson testified that both of those
events occurred because the Board learned that Olis had stopped cooperating with the government’s
investigation as required by his signed undertaking, and additional evidence had arisen that caused
the Board to suspect that Olis had known that Project Alpha was illegal and had acted unlawfully
and “not in the best interest” of the corporation. Therefore, according to Williamson, the Board
determined that Olis’ fees should be escrowed as permitted by Dynegy’s articles of incorporation,
instead of paid directly to Yates, until the Board could make a final determination as to Olis’ good
faith and lawful or unlawful actions. 
            Second, the trial evidence does not support a reasonable inference that Cracraft had any intent
not to perform as promised at the time she made the oral fee agreement on June 20, 2003. As to the
June 20, 2003 oral conversation between Cracraft and Clark, both testified that Cracraft said that
Dynegy was paying the fees for Olis and to just send her the bill. Clark stated she said the legal fees
were being paid pursuant to the Board resolution, while Cracraft stated she said the fees were being
paid pursuant to Olis’ undertaking. As to the conversation between Cracraft and Yates, she stated
it did not occur, while Yates stated she confirmed that Dynegy would pay the Olis legal fees directly
to Yates through trial. There is no evidence that Cracraft had any knowledge of Williamson’s desire
to cut off the payments of legal fees to the officers under investigation at the time she made the June
20, 2003 oral agreement. Yates argues that Cracraft had to be aware of the pressure being put on
Dynegy by the U.S. Attorney to cut off payment of the legal fees, and that, at a minimum, an
inference can be drawn that Cracraft knew of the government’s pressure to cut off legal fees on June
20, 2003 when she made the oral contract with Yates. However, there is no evidence in the record
from which such an inference can reasonably be drawn. Cracraft admitted being aware of the
Thompson Memo’s general cooperation requirements in May 2003, but not specifically with respect
to payment of legal fees for officers/employees. Cracraft also admitted that she wrote the May 2003
letter to Sharkey cutting off her legal fees, but stated that she did not know the reason for the letter
and was merely instructed to draft the letter by her supervisor; she later explained that Sharkey was
different from Olis because she was not an officer. Further, Cracraft testified that on June 20, 2003 
she had no knowledge of Williamson’s desire or intent during the six months prior to July 2003 to
modify or cut off the payment of the officers’ legal fees. In addition, Cracraft repeatedly told Clark
when he inquired about payment of the outstanding fee bills that she had no involvement with the
Board, and “did not know” exactly how the July 2003 escrow resolution changed the payment
procedure or when, or if, Yates would be paid. 
            Based on the foregoing, we conclude the evidence is legally insufficient to support the
judgment based on fraud because there is no evidence that supports a reasonable inference that
Cracraft had the intent not to perform at the time she made the June 20, 2003 oral fee agreement.


 
Without the fraud finding, there is no basis for the award of exemplary damages. Accordingly, we
reverse the trial court’s judgment, including its award of exemplary damages, and render a take
nothing judgment against Yates on his fraud claim. Yates’ Conditional Cross-Point
            Yates raises a conditional cross-point in the event this Court reverses the judgment based on
fraud. Specifically, he elects recovery under contract and asserts this Court must render judgment
in his favor on the jury’s breach of contract findings. When a judgment is reversed on appeal on one
theory of recovery, a party may seek recovery under an alternative theory that the jury found in its
favor at the trial court level. Transport Ins. Co. v. Faircloth, 898 S.W.2d 269, 274 (Tex. 1995);
Boyce Iron Works, Inc. v. Sw. Bell Tel. Co., 747 S.W.2d 785, 787 (Tex. 1988). Here, in addition to
the favorable jury finding on fraud, Yates also received an affirmative finding on his breach of
contract claim. 
            As an initial matter, Yates asserts that Dynegy has waived any error in the breach of contract
findings by failing to include such an issue in its appellant’s brief. We disagree. Yates moved for
judgment seeking damages under his fraud theory, and the final judgment was rendered on that
theory. See id. Therefore, to reverse the judgment on appeal, Dynegy was only required to challenge
the specific grounds upon which the judgment was based. See Cincinnati Life Ins. Co. v. Cates, 927
S.W.2d 623, 626 (Tex. 1996) (courts of appeals should consider all grounds the trial court rules on
and the movant preserves for appellate review that are necessary for final disposition of the appeal). 
Dynegy did not waive its right to assert alternative grounds denying Yates recovery in the event, as
here, we reverse the judgment on the fraud theory. See Oak Park Townhouses v. Brazosport Bank
of Tex., N.A., 851 S.W.2d 189, 190 n.3 (Tex. 1993) (per curiam) (citing Chesshir v. First State Bank
of Morton, Tex., 620 S.W.2d 101, 102 (Tex. 1981)) (party must raise the alternative grounds for
denying recovery in the court of appeals, either in its reply brief or on motion for rehearing). Here,
Dynegy responded to Yates’ conditional cross-appeal in its reply brief, arguing that Yates is not
entitled to judgment on the breach of contract theory. Therefore, Dynegy has not waived its right
to challenge Yates’ recovery under the alternative contract theory. 
            In its reply brief, Dynegy contends Yates is not entitled to judgment on the breach of contract
claim because: (1) “the fraud theory so infused the courtroom that reversal of that claim would
require a new trial on the contract claim;” (2) the trial court abused its discretion in admitting PX 93,
which was harmful hearsay; and (3) reversal of the fraud judgment would require a new trial on
attorney’s fees for the breach of contract claim.


 First, Texas Rule of Appellate Procedure 38.1
requires an appellant’s brief to “contain a clear and concise argument for the contention made, with
appropriate citations to authorities and to the record.” Tex. R. App. P. 38.1(i). Dynegy has waived
its “fraud theory so infused the courtroom” argument because its brief lacks any citations to the
record and any supporting legal authority for its one-sentence argument. See Nguyen v. Kosnoski,
93 S.W.3d 186, 188 (Tex. App.—Houston [14th Dist.] 2002, no pet.).
            Second, Dynegy argues the trial court abused its discretion in admitting, over Dynegy’s
objection, a handwritten post-it note marked as trial exhibit PX 93. The note states, “ASAP 6-20
FAX K TO DYN FOR FINAL APPROVAL ATTN: CRACRAFT. CALL FOR FAX # . . . BILL
DYN NOT CLIENT. DYN TO PAY FEES & EXPENSES PER K CRACRAFT.” Yates testified
this post-it note was attached to his fee agreement, which was faxed to Cracraft and was the subject
of their conversation on June 20, 2003. Dynegy contends that Yates used this post-it note to win the
“he-said, she-said” swearing match over whether a conversation between Yates and Cracraft
occurred—in other words, to prove the truth of the matter asserted; therefore, the admission of the
note was harmful error requiring reversal and a new trial on the contract claim. To obtain a new trial
based on the alleged evidentiary error, Dynegy must prove the error probably resulted in an improper
judgment, that is, that the jury’s findings on breach of contract turned on the post-it note. See City
of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex. 1995). Our review of the entire record
shows the post-it note is cumulative of the trial testimony given by Clark and Cracraft in which they
both stated that during their phone conversation on June 20, 2003 Cracraft told Clark that Dynegy
was paying Olis’ legal fees and to submit the bills directly to her. Dynegy asserts the note
necessarily corroborated Yates’ testimony about his conversation with Cracraft (which she denied)
during which he confirmed her receipt of the faxed fee agreement. Given that it is the jury’s role to
resolve conflicts in the evidence and to assess the credibility of the witnesses and the weight of their
testimony, we may not substitute our judgment for that of the jury’s. City of Keller, 168 S.W.3d at
819. Viewing the note in the context of the entire trial record, we cannot say the jury’s favorable
findings on the contract theory turned on the admission of the post-it note; any error in the admission
of PX 93 was harmless. See Alvarado, 897 S.W.2d at 753-54.
            Finally, Dynegy’s argument that if judgment is rendered on the contract claim, a new trial
will be required on attorney’s fees similarly fails. First, Dynegy cites us to no authority requiring
a new trial on attorney’s fees when one theory of recovery is reversed and judgment is rendered on
an alternative theory on which favorable findings were also returned. The two cases cited by Dynegy
involve remand for a new trial on attorney’s fees based on a reduction in damages on appeal under
a single theory of recovery. See Barker v. Eckman, 213 S.W.3d 306, 313-15 (Tex. 2006); Young v.
Qualls, 223 S.W.3d 312, 314-15 (Tex. 2007) (per curiam). In those cases, the Supreme Court held
that because it could not be reasonably certain that the erroneous damages award did not significantly
affect the fact finder’s consideration of the “results obtained” factor under the Arthur Andersen
analysis, a new trial on attorney’s fees was required. See Barker, 213 S.W.3d at 314-15; Young, 223
S.W.3d at 314-15 (citing Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex.
1997)). Those cases are distinguishable, however, because here the damages being reversed are for
fraud, a claim for which no attorney’s fees are recoverable; therefore, there is no risk the jury was
affected by an erroneous amount of damages in calculating the reasonable attorney’s fees recoverable
on the contract claim. At trial, counsel for Yates presented evidence as to the legal work performed
on the contract claim, segregated from the fraud claim, as required. See Tony Gullo, 212 S.W.3d at
313-14. In Question No. 6, the jury made specific findings on the amount of necessary legal services
attributable solely to Yates’ contract claim, finding that $574,718 in fees were incurred through trial
and post-trial; the jury further found that conditional appellate fees were $125,000 for an appeal to
the Court of Appeals, $25,000 for filing a petition for review in the Texas Supreme Court, and
$35,000 if the Supreme Court granted review. We conclude that judgment may properly be rendered
in favor of Yates on his breach of contract claim as well as for recovery of attorney’s fees under the
contract claim. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2008).
Conclusion
            Based on the foregoing analysis, we reverse the trial court’s judgment based on the jury’s
fraud findings, including its award of exemplary damages, and render a take-nothing judgment
against Yates on the fraud claim. Because the jury also returned favorable findings on Yates’
alternative breach of contract theory, and Yates seeks recovery under that alternative theory, we
render judgment in favor of Yates based on the jury’s breach of contract findings and award Yates
actual damages of $448,556, plus prejudgment and post-judgment interest. Further, based on the
jury’s findings as to the reasonable and necessary attorney’s fees recoverable for the breach of
contract claim, we award Yates $699,718 in trial, post-trial and appellate attorney’s fees, plus
$60,000 in conditional appellate fees. 
 
                                                                                    Phylis J. Speedlin, Justice